CLERK'S COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,

      Plaintiff/Counter-Defendant/Third-Party Plaintiff,

vs.                                     No. CIV 98-740 MV/RLP

JACQUELINE GARCIA,

      Defendant/Counter-Plaintiff,

ALLSTATE INSURANCE COMPANY
and RICKY CHADWICK,

      Third-Party Defendants,

and

CORA CHADWICK, Individually, RICKY CHADWICK,
as the Co-Personal Representative of the ESTATE OF
ROBERT SHEPPARD and the ESTATE OF ERMELINDA
SHEPPARD, and FIRST FINANCIAL TRUST COMPANY,
as the Co-Personal Representative of the ESTATE OF
ROBERT SHEPPARD, and the ESTATE OF ERMELINDA
SHEPPARD, and as TRUSTEE of the ROBERT SHEPPARD
and ERMELINDA SHEPPARD SHRINER'S CHILDREN
HOSPITAL TRUST,

      Plaintiffs-in-Intervention,

vs.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,
      Defendant-in-Intervention,

vs.

JACQUELINE GARCIA, RICKY CHADWICK,
and ALLSTATE INSURANCE COMPANY,
      Third-Party Defendants on Complaint in Intervention.



# MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on (1) Defendants/Counter-Plaintiffs Jacqueline Garcia, Cora Chadwick, and Rick Chadwick's Motion to Dismiss With Prejudice Claims for Intentional Infliction of Emotional Distress and Prima Facie Tort, filed October 26, 1999 **[Doc. No. 218]**; (2) Plaintiff Burlington Northern and Santa Fe Railway Company's (BNSF) First Motion for Partial Summary Judgment filed October 8, 1999 **[Doc. No. 200]**; (3) Plaintiff BNSF's Second Motion for Partial Summary Judgment filed October 8, 1999 **[Doc. No. 190]**; (4) Plaintiff BNSF's Third Motion for Partial Summary Judgment filed October 8, 1999 **[Doc. No. 194]**; Plaintiff BNSF's Fourth Motion for Partial Summary Judgment filed October 8, 1999 **[Doc. No. 204]**; Defendant Jacqueline Garcia's Motion for Summary Judgment, filed October 8, 1999 **[Doc. No. 183]**.

The Court, having considered the parties' pleadings, the applicable law, and being otherwise fully informed, finds that: (1) Defendants/Counter-Plaintiffs Jacqueline Garcia , Cora Chadwick and Rick Chadwick's Motion to Dismiss is well taken and will be **GRANTED**; (2) Plaintiff BNSF's First Motion for Partial Summary Judgment is partially well taken and will be **GRANTED IN PART** and **DENIED IN PART**; (3) Plaintiff BNSF's Second Motion for Partial Summary Judgment is partially well taken and will be **GRANTED IN PART** and **DENIED IN PART**; (4) Plaintiff BNSF's Third Motion for Partial Summary Judgment is well taken and will be **GRANTED**; (5) Plaintiff BNSF's Fourth Motion for Summary Judgment is **MOOT**; (6) Defendant Jacqueline Garcia's Motion for Summary Judgment is not well taken and will be **DENIED**.

## BACKGROUND

The Court finds the following material facts to be undisputed.[1]

1. Plaintiff, Burlington Northern and Santa Fe Railroad (BNSF), filed suit after a devastating collision that occurred on March 15, 1997 at approximately 10:57 p.m., between a BNSF train and a vehicle driven by Defendant/Counter-Plaintiff Jacqueline Garcia (Garcia). Garcia's two young children, Ermelinda Sheppard and Robert Sheppard, were killed as a result of the collision and ensuing explosion.

2. The collision occurred near Mountainair, New Mexico, a small rural community located in Torrance County, New Mexico, about sixty miles east of Belen, New Mexico.

3. BNSF is a railway company that owns and operates trains and related tracks and other railway facilities across thousands of miles of track in many states, including New Mexico. BNSF's transcontinental mainline railway runs east-west through New Mexico from near Clovis on the east to near Gallup on the west. The east-west mainline runs through Mountainair, New Mexico.

4. Garcia was 22 years of age on March 15, 1997, the date of the accident. Garcia was born in Albuquerque and lived in Mountainair part of her life. Her grandmother's house is located a few hundred feet north of BNSF's railroad tracks. Garcia stayed with and visited her grandmother many times. At the time of the accident, Garcia and her children were living with her mother and stepfather, Cora Chadwick and Rick Chadwick, in Rio Rancho, New Mexico.

---

[1]The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

5.      In the early afternoon of March 15, 1997, Garcia and several acquaintances began drinking alcohol. Over the period from approximately 2:30 p.m. to 7:30 p.m. Garcia drank approximately 48 ounces of beer, equal to four 12-ounce cans of beer. Between 7:45 p.m. and 9:30 p.m. Garcia consumed an additional approximate 20 ounces of malt liquor.

6.      After vising with her friends, Garcia returned to her vehicle and placed her children in the back seat. Garcia started driving with a friend, Cabrini Hallifax. Garcia began following another vehicle driven by an acquaintance, Marcia Lopez. Miguel Lovato was a passenger in Lopez's vehicle. Lopez's vehicle, followed by Garcia's vehicle left the paved street in Mountainair, Main Street, and drove onto the dirt road located on BNSF's property that leads to the former BNSF depot building.

7.      The former BNSF depot building was once used for passenger trains through Mountainair. It is now frequented by maintenance crews, signal maintainers and other BNSF employees and contractors.

8.      A warning sign is located on the dirt road leading to the BNSF depot building. The sign reads "Notice. This is Private Property. Trespassers are Warned to Keep Off." The sign was over nine feet tall, on the left side of the road, and used non-reflective paint.

9.      At the time the vehicles entered BNSF property from Main Street, neither Lopez, Garcia, nor any of the passenger saw the warning sign. Nor had they seen this sign prior to that evening. Miguel Lopez had seen other warning signs on BNSF property prior to the collision.

10.     Garcia did not know when she entered the dirt road that she was entering BNSF property. Garcia believed that she was entering a dirt service road that runs adjacent to the railroad property.

4

11.    It was dark and there was no artificial lighting aside from the vehicle headlights when the Garcia and Lopez vehicles entered BNSF property.

12.    BNSF has north and south mainline tracks upon which the trains run in an east-west direction.  Parallel to the mainline track is a "house track" or "service track" which is not used for train service, but rather is used by BNSF for maintenance of railcars.  The house track lies to the north of the mainline track.  A state highway overpass traverses above the BNSF railroads roughly 1100 feet west of the BNSF depot building.  The house track roughly parallels the BNSF mainline tracks for several hundred feet west of the overpass until it converges toward and ultimately merges into the BNSF north track.

13.    The vehicles driven by Garcia and Lopez traveled westerly on the dirt road past the BNSF depot building adjacent to the BNSF mainline tracks which run in an east-west direction. Garcia and Lopez drove towards the highway overpass.  The vehicles were between the BNSF north mainline track and the house track.

14.    When Garcia had traveled about 1,200 feet in a westerly direction she realized that she was not on a dirt road, but rather was in an area between the house track and the BNSF north mainline track.

15.    As the vehicles continued west, they drove onto the house track where both vehicles became stuck. Lopez, Garcia and the passengers attempted to free the cars by pushing, while the children remained asleep in the backseat of Garcia's car.  The cars were pushed to an area between the north mainline and the house track.

16.    "Fouling" is a term used in the railroad industry to denote a condition where an object is in close proximity to the tracks and represents a hazard.  "Fouling" of a track occurs anytime an

5

individual or an object is within five feet of the track, when there is an oncoming train. The parties dispute whether Garcia's vehicle was "fouling" the track after she pushed the car off the house track to the area between the north mainline and house track.

16.     While pushing the cars, Garcia, Lopez and the passengers observed an oncoming BNSF westbound train that was traveling on the north BNSF mainline track.

17.     At about 10:50 p.m., several minutes prior to the collision, BNSF was operating an eastbound train on the south mainline track and westbound train on the north mainline track. At that time, the north and south mainline tracks converged to a single operating track. The westbound train had the right of way. Accordingly, the eastbound train was operating under a signal which told the crew that it needed to slow its speed and come to a stop on the south track before the point at which the north and south tracks converged. Julian Rubio was the conductor of the eastbound train. Woody Hunter was the engineer to the westbound train.

18.     As the eastbound train moved slowly through the south track between the overpass and the BNSF depot, the crew saw the vehicles driven by Garcia and Lopez. At that time the vehicles were on BNSF property, between the mainline and house tracks, still near the BNSF depot but heading west towards the overpass. The eastbound crew lost sight of the vehicles as the train traveled around the curving tracks.

19.     Rubio believed these vehicles to be private cars operated by BNSF employees conducting company business. Rubio had not received any track warnings, radio communications or bulletins notifying him or other crews that work was being performed in the area. In the opinion of Rubio and the BNSF crew, the vehicles, at the time they were first observed, did not pose any risk. Rubio did not notify the westbound train of the vehicles in the vicinity, nor did he take any

6

action to verify that the vehicles belonged to BNSF employees.

20.     BNSF's policy, which was in effect the night of the collision, required BNSF to immediately notify other BNSF personnel of any condition creating a hazard, regardless of whether the hazardous condition involved another BNSF employee, a contractor, or a member of the public.

21.     After passing the eastbound train, the engineer of the westbound train, Hunter, first noticed the vehicles in the vicinity of the overpass between the north mainline and the house track. In Hunter's opinion the vehicles were clear of the tracks. The westbound train blew its whistle to alert the vehicles of the train's approach.

22.     When the westbound train blew its whistle, Garcia was in her vehicle after having pushed it off the house track to an area between the north mainline and house track. Garcia heard the oncoming westbound train and saw the lights of the train in her rear-view mirror. One of Garcia's friends told Garcia "Stay where you are, you're fine" or words to that effect.

23.     Garcia, believing the car was in danger, accelerated her car forward in a westerly direction. Garcia mistakenly believed there was a crossing further west and she could get out the train's way. In fact, Garcia's action placed her dangerously near the point of convergence of the north mainline and the house track.

24.     The westbound train was traveling approximately 44-46 m.p.h. when Hunter saw Garcia's vehicle accelerating towards the north mainline track. Hunter immediately applied the train's emergency brakes. The stopping distance of the train was approximately 2,200 feet.

25.     The westbound train struck Garcia's vehicle, which subsequently caught on fire. Although Garcia escaped, the children perished in the fire.

7

26.     The westbound train came to rest approximately 2,000 feet away from Garcia's vehicle. The westbound crew did not attempt to extinguish the fire, although the train was equipped with fire extinguishers.

27.     Cargo carried in the westbound train was damaged in the collision. The conductor and engineer of the westbound train took trauma leave following the incident.

28.     The area around the BNSF depot is visited by the townspeople of Mountainair. People had frequently driven through the area, and walked across the tracks. In the winter, children and parents inner tube down the hills next to the tracks. BNSF crews had seen members of the public taking photographs and visiting the area. Graffiti was also found on the property.

29.     In the year prior to the collision, BNSF patrol agents had ejected two groups of trespassers in this area, east of the BNSF depot. There are no BNSF records reflecting that there have been trespassers in the area of the collision.

30.     Following the collision, BNSF sent a few letters to Rick Chadwick, as administrator of the children's estates, requesting a mutual release of liability. These letters later became the subject of part of this litigation.


I.      **MOTION TO DISMISS, WITH PREJUDICE, CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND PRIMA FACIE TORT RELATED TO BNSF'S LETTERS**

**BACKGROUND**

Defendants/Counter-Plaintiffs Garcia, Cora Chadwick and Rick Chadwick (Garcia, *et. al.*) move this Court to dismiss, with prejudice, their own claims of intentional infliction of emotional distress and prima facie tort related to certain letters sent by BNSF shortly after the

8

collision alleging that Garcia was solely to blame for the tragedy. As grounds for the voluntary

dismissal, Garcia, *et. al.* assert that as a result of this Court's July 20, 1999 joinder of several

state claims, the claims related to the letter are relatively minor and would divert necessary

resources from the other claims against BNSF. After receiving notice that Garcia, *et. al.*

intended to dismiss these claims with prejudice, BNSF filed its fourth motion for partial

summary judgment on the claims related to the letters. In the present motion to dismiss, BNSF

has made clear its desire to be awarded costs and attorney fees incurred as a result of Garcia, *et.*

*al.*'s letter-related claims, including the costs associated with filing the fourth motion for partial

summary judgment. As grounds for the award, BNSF asserts that the motion to dismiss is

untimely and comes after BNSF incurred significant litigation costs.


## LEGAL STANDARD OF REVIEW

FED. R. CIV. P. 41(a)(2) governs voluntary dismissals after the opposing party has filed

an answer or motion for summary judgment. *See Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir.

1993). Pursuant to Rule 41(a)(2), "an action should not be dismissed save upon order of the

Court and upon such terms and conditions as the Court deems proper." The Court has discretion

in determining whether to grant a motion for voluntary dismissal. *See Clark v. Tansy*, 13 F.3d at

1411. In exercising its discretion, the Court should consider the purpose of Rule 41(a), which is

"primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the

imposition of curative conditions." *Id.* When dismissing an action with prejudice, the Court

should award attorney fees to the opposing party only under exceptional circumstances. *See*

*AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528 (10th Cir. 1997). For example, the Tenth Circuit

has found exceptional circumstances to be present when a litigant makes a practice of bringing claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party. *Id.* Under FED. R. CIV. P. 54(d) costs may be taxed by the prevailing party when an action is voluntarily dismissed with prejudice. *Id.* The district court must provide a valid reason for not awarding costs to the prevailing party. *Id.* For example, a denial of costs does not constitute an abuse of discretion when the prevailing party is only partially successful. *Id.*

## DISCUSSION

The Court finds that it is appropriate to grant the motion to dismiss with prejudice. Garcia, *et. al* offer a persuasive justification that the action related to the BNSF letters represent a minor claim and would further complicate an already complicated case. However, in this case, there are no "exceptional circumstances" justifying an award of attorney fees. This is not a situation where Garcia, *et. al.* have been filing multiple frivolous or vexatious claims for the purpose of forcing BNSF to incur litigation expenses. The mere fact that the motion for voluntary dismissal was filed at a late stage in the litigation, does not in the Court's opinion rise to the level of "exceptional circumstances." As distinguished from attorney fees, BNSF is entitled to have costs taxed against Garcia, *et. al* pursuant to FED. R. CIV. P. 54(d). The Court, in its discretion, however, limits the award to only those costs incurred during the course of defending against the prima facie tort and intentional infliction of emotional distress. Any costs which can be attributed to other causes of action in this litigation should not be awarded.

The Court's dismissal with prejudice of the prima facie tort and intentional infliction of

10

emotional distress claims renders BNSF's fourth motion for partial summary judgment moot.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### LEGAL STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United*

*States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## DISCUSSION

### A.    FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT

In its first motion, Plaintiff BNSF moves the Court to find as a matter of law: (1) that Garcia was a trespasser on the night of the collision; (2) that Garcia was negligent for driving onto BNSF's property; and (3) that Garcia was negligent per se for driving while intoxicated and for failing to maintain proper lookout.

#### 1.    Garcia as a Trespasser on BNSF's Property

BNSF asks the Court to find that Garcia was a trespasser on BNSF's property the night of the collision. Such a finding would implicate the legal duty owed by BNSF to Garcia once she was on BNSF property. Under New Mexico law, "a trespasser is a person who enters or remains upon the premises of another without the express or implied permission of the owner of the premises." UJI 13-1301 NMRA 1999. BNSF argues that Garcia had no permission to be on the premises and had been notified by the warning sign that she was trespassing when she entered the dirt road leading to the BNSF depot. Garcia responds that she had not seen the warning sign,

12

and did not realize she was on BNSF property until she was on the house track. Garcia further

contends that BNSF was aware that townspeople and children used the railroad tracks for

recreational purposes and had not objected to such use. Accordingly, Garcia argues that BNSF

gave Garcia, as well as the townspeople of Mountainair, implied permission to enter its property.

Garcia finally argues that BNSF Conductor Julian Rubio's failure to report Garcia after he

noticed her vehicle near the BNSF depot is equivalent to implied permission for Garcia to remain

on the property.

The Court is not persuaded by Garcia's arguments. First, Garcia's lack of awareness that

she was not trespassing does not affect her status as a trespasser. Intent or knowledge is not an

element of trespassing under New Mexico law. *See, e.g., Restatement of Torts* § 329 comment

(c). Garcia's failure to notice the BNSF warning sign is relevant only to whether BNSF provided

adequate notice or to whether Garcia maintained proper lookout. Her failure to see the sign does

not logically relate to whether Garcia's entrance onto BNSF property was permitted.

The Court also does not accept Garcia's claim that she had been given implied permission

to enter and remain on BNSF property. Although New Mexico law does not address the issue of

when implied permission is given, the law in other states provides some guidance. *See Armijo v.*

*Ex. Cam., Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) (when state law is unclear, federal court

sitting in diversity should consider "decisions of other states, and the general weight and trend of

authority"). Generally implied permission to enter land may be found only when an owner with

actual knowledge fails to take reasonable steps to prevent or discourage persons from entering

the land. *See, e.g., Prosser on Torts* § 58; *Madison v. Deseret Livestock*, 574 F.2d 1027 (10th

Cir. 1978); *Hall v. Holton*, 330 So.2d 81, 83 (Fla. Ct. App. 1976); *Longbotton v. Sim-Kar*

13

*Lighting Fixture Co.*, 651 A.2d 621, 622-23 (Pa. Commw. Ct. 1994). Thus, the mere fact that people had congregated on BNSF property in the past, even in the presence of BNSF employees, did not give a blanket license for Garcia, or anyone else, to enter BNSF property. Here, there is evidence that BNSF had taken steps to discourage trespassers from entering the land, both with the warning sign and with the roving patrol that ejected trespassers. These steps clearly indicate that BNSF did not give consent to entrants on its property.

Finally, Conductor Julian Rubio's failure to take steps to eject Garcia after he had noticed her vehicle is immaterial to a determination of whether Garcia was trespassing. The undisputed evidence indicates that Rubio believed that Garcia's vehicle belonged to a BNSF employee. Therefore, his failure to take action cannot be construed as giving Garcia implied permission to remain on BNSF land. Whether Rubio's belief was reasonable is an issue at dispute between the parties, which will not be addressed by the Court at this time.

On these grounds, the Court finds that there is no genuine dispute of material fact that Garcia was a trespasser on BNSF property the night of the collision. It is clear under applicable law that Garcia was a trespasser. BNSF's motion for summary judgment as to Garcia's status as a trespasser is granted.

### 2.    Garcia's Negligence

BNSF also asks the Court to find as a matter of law that Garcia was negligent for driving her automobile onto BNSF property and crossing in front of the westbound train. As a driver of an automobile, it is undisputed that Garcia had a duty of ordinary car to both her passengers and to those in the surrounding area. *See* UJI 13-1201 NMRA 1999. In addition, under New Mexico

14

law, "it is the duty of every operator of a vehicle, at all times, to keep a proper lookout and to maintain proper control of his/her vehicle so as to avoid placing the operator or others in danger and to prevent an accident." *See* UJI 13-1202 NMRA 1999; *Trujillo v. Treat*, 107 N.M. 58, 59 (Ct. App. 1988); *Porter v. Ferguson-Steere Motor Co.*, 63 N.M. 466 (1958). The duty requires a person "to actually see what is in plain sight or is obviously apparent to one under like or similar circumstances." *Trujillo*, 107 N.M. at 59. Garcia as an entrant onto BNSF property also had a duty of care to BNSF. *See Restatement of Torts* § 381.

BNSF alleges that Garcia breached these various duties of care by entering railroad property, despite the "No Trespassing" sign posted on the dirt road leading to BNSF depot. Garcia disputes that the sign was in fact visible at night, and maintains it provided inadequate warning. BNSF counters that Garcia would have seen the sign had she been maintaining proper lookout. Both of these arguments can be supported by the available evidence. As such, the Court finds that there is a genuine issue of material fact making summary judgment inappropriate as to Garcia's negligence in failing to see the "no trespassing" sign and entering BNSF property.

BNSF also alleges that Garcia should have known of the risk of harm to herself and her children by entering a railroad area. Garcia maintains that she did not realize she was on railroad property until she driven well into the area. She further argues that the dirt road she entered was easily mistaken for a public road which runs adjacent to BNSF property. Finally, Garcia contends that when she did realize she was on BNSF property, she attempted to leave the property by driving to what she believed was a crossing point. Likewise, as to this alleged breach of duty there is a genuine issue of material fact making summary judgment inappropriate.

Finally, BNSF alleges that Garcia was negligent for suddenly accelerating her vehicle

from a safe position to a hazardous position on the railroad tracks when the westbound train was approaching. Garcia argues that her actions were the result of understandable panic, that she reasonably believed she was in peril, and that she may have been struck by the train even if she did not suddenly accelerate. In this instance there is also a genuine dispute as to material fact making summary judgment inappropriate.

The Court finds that BNSF has failed to establish as a matter of law that Garcia's actions were unreasonable, a breach of her duty of care, and were the proximate cause of her injuries. It is a matter for the trier of fact to determine whether, based upon the evidence, Garcia was in fact negligent. On these grounds BNSF's motion for summary judgment as to Garcia's negligence is denied.

### 3. Garcia's Negligence Per Se

BNSF moves this Court to rule as a matter of law that Garcia was negligent per se for driving while intoxicated in violation of New Mexico law. In order to state a claim for negligence per se under New Mexico law, a party must prove (1) there is a statute which prescribes certain actions or defines a certain standard of conduct, either explicitly or implicitly; (2) the defendant violated the statute; (3) the plaintiff was in the class of persons sought to be protected by the statute; and (4) the harm or injury to the plaintiff was of the same type of harm or injury the statute aims to prevent. *See Archibeque v. Homrich*, 88 N.M. 527, 532 (1975); UJI 13-1501 NMRA 1999.

BNSF argues that Garcia was negligent per se for driving under the influence of alcohol in violation of NMSA §66-8-102A. Under this statute, a driver is considered to be under the

16

influence if "to the slightest degree" the driver was less able, either mentally or physically, to

exercise the clear judgment and steady hand necessary to handle an automobile with safety to

himself and others. *State v. Deming*, 66 N.M. 175 (1959); *State v. Meyers*, 88 N.M. 16 (Ct. App.

1975). Although Garcia admits that she had consumed 48 ounces of beer and approximately 20

ounces of malt liquor in the hours prior to the collision, she disputes that she was intoxicated.

Under New Mexico law, there is a presumption of intoxication at a blood alcohol level of .08%.

NMSA § 66-8-102(C) 1978 (Repl. 1998). There is a dispute among the parties as to whether

Garcia's blood alcohol level had reached this legal limit. No blood alcohol level test was

conducted at the time of the collision. A test conducted several hours after the collision reveals

that Garcia had a blood alcohol level of .02 %. From this figure, expert toxicologists for each

party have extrapolated different blood alcohol levels at the time of collision. BNSF's expert

estimates that Garcia's blood alcohol level was .1%, in violation of the legal limit. Garcia's

expert estimates Garcia's blood alcohol level at .0785 %, which is below the legal limit.

Garcia's expert opines that at a blood alcohol level of .0785%, Garcia would have been

experiencing diminished hand-eye coordination and " a decrement in judgment and attentional

factors." *Rapport Deposition* at 72. While such testimony may establish a violation of NMSA

§66-8-102A, Garcia's expert disputes the validity of the breathalyzer test from which Garcia's

purported blood alcohol level is extrapolated. Finally, witnesses who observed Garcia prior to

the accident testified that she did not appear to be intoxicated. The mere fact that Garcia had

consumed a large amount of alcohol in the afternoon and evening prior to the accident is

insufficient by itself to support a finding that Garcia was intoxicated as a matter of law. *See*

*Lopez v. Maes*, 81 N.M. 693 (Ct. App. 1970) (consumption of six beers in a two hour period does

not give rise to a presumption of intoxication). The Court finds there to be a material issue of fact as to whether Garcia was in fact driving under the influence of alcohol and whether her driving was impaired by the alcohol. As such, summary judgment on this issue is inappropriate at this time.

## B. SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

In its second motion for partial summary judgment, BNSF asks the Court find as a matter of law that because Garcia was a trespasser, BNSF owed no duty of care except to refrain from willful and wanton conduct. BNSF also requests that the Court grant summary judgment in its favor as to Count I of Garcia's Counterclaim, and Counts I and IV of the Complaint-In-Intervention asserted, respectively by the Estates of the children and Cora Chadwick. Specifically, BNSF asks the Court to find as a matter of law that the alleged negligent acts performed by BNSF do not amount to willful or wanton conduct.

### 1. Applicable Duty of Care Owed by BNSF to Garcia, *et. al.*

The status of an entrant onto land, determines the duty of care owed by landowner. *See Ford v. Bd. of County Cm'rs*, 118, NM 134 (1994). Generally speaking, a landowner owes no duty of care to a trespasser, except to refrain from willfully or wantonly injuring the person. *Maldonado v. U.S.,* 893 F.2d 267, 270 (10th Cir. 1990); *Latimer v. City of Clovis*, 83 N.M. 610, 616 (Ct. App. 1972). New Mexico law provides for a narrow exception from the harsh effects of

this rule.[2] *See Ford v. Bd of County Cm'rs,* 118 N.M. 134, 139 n. 4. (N.M. 1994) (the rules

governing the duty of care owed to a trespasser by a landowner remain as they are found in

SCRA 1986, 13-1305 - 13-1307). As articulated in UJI 13-1306, a landowner owes a duty of

reasonable care to trespassers if :

(1)     the landowner engages in activities that involve an unreasonable risk of death or

        great bodily harm to persons coming on the land;

(2)     the landowner knows or reasonably should have known that there are constant

        intrusions by trespassers on the area where the activity is permitted, or that the

        trespasser was in dangerous proximity to the activity ; and

(3)     the landowner has reason to believe that the trespasser will not realize the risk of

        harm involved.

Under the first prong of UJI 1306, the Court must determine whether BNSF was

engaging in an activity that involved an unreasonable risk of death or great bodily harm.  BNSF

disputes that the railroad operation involved an unreasonable risk of death and great bodily harm.

As support for their position, BNSF cites to *Galbadon v. Erisa Mortgage Co.*, a recent case in

which the New Mexico Court of Appeals discussed the criteria for determining whether an

activity is inherently dangerous.  1999-NMSC-039, Vol. 38, No. 44, SBB 2.  *Galbadon* involved

---

[2]     Garcia attempts to argue that under New Mexico law, a landowner owes a duty of
ordinary care to avoid injury to known trespassers. *See James v. Atchison,* 464 F.2d  173, 176
(10th Cir. 1972) and *Latimer v. City of Clovis,* 83 N.M. 610, 616 (1972).  However,  the cases
cited by Garcia, *et. al.* have been superseded by New Mexico's 1978 adoption of the Uniform
Jury Instructions.  *Maldano v. U.S.,* 893 F.2d 267, 270 (10th Cir. 1990).  The New Mexico
Supreme Court has specifically instructed that UJI 13-1305 through 13-1307 set forth the
applicable duty of care owed by a landowner to a trespasser. *Ford v. Bd of County Com'rs,* 118
N.M. at 139 n. 4.

the drowning of a child in a recreational waterpark wave machine. The *Galabon* court was concerned with whether the owner of the theme park owed a non-delegable duty to ensure the safety of the waterpark patrons. Citing to a four-part inquiry adopted in *Saiz v. Belen School District*, 113 N.M. 387 (1992), the *Galabon* court determined that the wave machine was not inherently dangerous and therefore no non-delegable duty was owed by the landowner to the waterpark patrons. *Galabon* is distinguishable from the case at hand in that *Galabon* involved a non-delegable duty of care arising from an inherently dangerous activity. The injured party in *Galabon* was a business patron, rather than a trespasser, who was seeking to hold the landowner liable. The landowner, as a defense, argued that any duty of care owed to the patron had been delegated by the landowner to the lessee of the premises, and as such only the lessee could be found liable. In contrast, Garcia, *et. al.* argue only that an ordinary duty of care was required, not a more stringent non-delegable duty. Garcia, *et. al.* do not seek to hold liable anyone other than BNSF - the owner and operator of the premises. Furthermore, by requesting that the Court analyze BNSF's train operations under the "inherently dangerous" standard, BNSF seeks to require a higher showing of dangerousness than the "unreasonable risk of death or serious bodily injury" required under NM 13-1306 to establish a landowner's duty of care to a trespasser. The Court therefore finds that the *Galabon* inherently dangerous inquiry is inapplicable to the facts of this case. Furthermore, the Court rejects BNSF's argument that as a matter of law train operations do not involve an unreasonable risk of death or serious bodily harm. While the operation of trains can be done in a manner that reduces the risk to persons in the vicinity, there is a potential danger that arises from the activity. This is all too evident from the deaths of Ermelinda and Robert Sheppard. The combination of the railroad operations, the curve of the

20

tracks and the dark condition may have led to a situation which involved an unreasonable risk of harm. Furthermore, BNSF takes the very opposite position later on in its motion, arguing that the danger of the tracks was so open and obvious that Garcia should have reasonably avoided the railroad tracks. The Court finds that the issue of whether the risk of death or serious bodily injury was unreasonable is an issue of fact which should be reserved for trial. At this juncture, Garcia, *et. al.* have raised sufficient facts demonstrating that there is a genuine dispute of material facts as to whether the BNSF train operations involved an unreasonable risk.

BNSF next argues that it did not have actual or constructive knowledge of constant intrusions on BNSF property where the railroad tracks run. Construing the evidence in favor of the nonmoving party, Garcia, the Court is satisfied that there is a genuine issue of material fact as to whether BNSF had constructive knowledge that trespassers entered the railroad premises. The railroad tracks in question are adjacent to a well-settled community. The evidence demonstrates that it was not uncommon to enter the railroad tracks for amusement including inner tubing on the snow, driving vehicles on the hills next to the tracks, taking photographs and laying pennies down on the railroad tracks for oncoming trains. There is also evidence that Miguel Lovato, one of the passengers in the car accompanying Garcia the night of the collision, had on several occasions used the dirt road leading from the BNSF depot. Even more persuasive are the accounts of BNSF employees observing trespassers on BNSF property. BNSF engineer Woody Hunter had witnessed townspeople entering the land near the BNSF depot for recreation on more than one occasion. BNSF "special agents" had ejected two groups of trespassers from the area east of the BNSF depot in the year prior to the collision. Furthermore, there is evidence of graffiti on the property, indicating the presence of trespassers. These factors at the very least

21

create an issue of fact as to whether BNSF should have been alerted that trespassers were constantly entering the area surrounding railroad tracks. *See, James v. Atchinson*, 464 F.2d at 175 (railroad company had constructive knowledge of trespassers where railroad tracks lie adjacent to community and evidence suggests railroad employees witnessed persons on the premises). Even if these trespassers were not in the exact location of the collision, their presence may have suggested to BNSF that trespassers were entering the property from the dirt road near the BNSF depot, as Garcia entered the night of the collision. In addition, there is evidence suggesting that BNSF conductor Julian Rubio saw Garcia's vehicle in advance of the collision, thereby creating actual notice. While the Court does not base its holding on this evidence, it is sufficient to note that there were many factors that may have put BNSF on notice of trespassers. The Court therefore finds that as a matter of law, there is a genuine dispute of material fact as to whether BNSF had knowledge, or should have had knowledge of trespassers entering the railroad tracks near the vicinity of the BNSF depot.

The third prong of 13-1306 requires an inquiry into whether BNSF had reason to believe that Garcia would not realize the risk of entering BNSF property and driving in proximity to the railroad tracks. The Court is not aware of any New Mexico legal authority addressing under what circumstances a landowner has "reason to believe" a trespasser would not realize the danger involved. The *Restatement of Torts* provides some guidance to the Court. *Restatement of Torts* § 336, comment (c), which sets forth the duty of care owed by a landlord to constant trespassers, clarifies the meaning of the phrase "has reason to know." Specifically comment (c) states that "reason to know" does not convey upon a landowner a duty to inspect, "until some fact known to him apprises him of the necessity thereof." The *Restatement of Torts*, § 336, comment (d)(1)

22

further clarifies that "the possessor of land is entitled to expect that the trespasser who . . . has reason to believe that the possessor intends to do an act which involves danger to the trespasser will yield precedence to him and, *knowing of the danger, will avoid it. . .*" (emphasis added). Comment (d)(2) of § 336 goes on to advise that "[t]he trespasser, having no privilege to enter the premises, must realize that he should be on the alert to observe not only the condition of the land, but also the possessor's activities. The possessor is therefore *entitled to assume that a trespasser will realize his danger* under conditions in which such an assumption would be permissible. . ." Thus, according to the *Restatement of Torts* commentary, a possessor of land is entitled to presume that dangerous activities or conditions will be appreciated by the trespasser, unless the possessor already has facts within its knowledge to undermine such a presumption, or unless the conditions of the activity are such that the danger would typically not be appreciated. *See, e.g., Noland v. Soo Line Railroad Co.* 474 N.W.2d 4, 6 (Minn. Ct. App. 1991) (snowmobiler raised sufficient issue of fact that danger of railroad trestle was not apparent by arguing the trestle was concealed with snow and visibility was reduced by darkness and blowing snow). The threshold questions, therefore, are whether (1) BNSF had been apprised of any facts which would put it on notice that Garcia did not realize the danger associated with the railroad tracks, or (2) whether the danger was of such an open and obvious type that BNSF was entitled to expect Garcia would appreciate the danger and yield to it.

BNSF urges the Court to find as a matter of law that railroad activity is of a type that is so open and obvious that a trespasser is charged with knowledge of its danger. BNSF cites to a string of non-binding authority supporting this proposition. *See, e.g., Herrera v. Southern Pac. Co.*, 188 Cal.App.2d 441, 446 (1961) ("Nothing could be more pregnant with warning of danger

23

than the appearance of a huge, rumbling string of railroad cars"); *Eichelberg v. National R.R. Passenger Corp.*, 57 F.3d 1179, 1185 (2d Cir. 1995) (when railroad engineer first sees pedestrian on tracks, the engineer is entitled to assume, at least at first, that given an appropriate warning, pedestrian will take precautions to avoid obvious danger of onrushing train). Despite this informative authority, the Court believes that it is not appropriate to rule as a matter of law that trespassers are charged with knowledge of the danger of railroads. Such a finding would necessarily go to Garcia's own negligence, rather than to any duty of care owed by BNSF. Rather, the Court prefers to view the specific facts of the case to determine whether any evidence on the record gives rise to an inference that BNSF had reason to know Garcia would not be aware of the danger.

Garcia, *et. al.* have offered some evidence to support a finding that BNSF had a reason to believe Garcia would not realize the danger of the railroad tracks. For instance, Garcia, *et. al.* allege that the railroad tracks were level with the dirt, and thus not visible in the dark. Garcia, *et. al.* also allege that the "no trespassing" sign was not sufficient to warn of the danger. Garcia, et. al. allege that the curve of the tracks, coupled with the convergence of the house track and the main track created a hidden danger which an entrant on to BNSF property would not appreciate. Furthermore, Garcia, *et. al.* maintain that the train tracks were not visible until the point of peril, when the vehicle was already stuck on the tracks. Finally, BNSF as owner and operator of the property was in a position to have superior knowledge of the dangers associated with the railroad operations. All these factors create a factual issue as to whether BNSF had reason to know that Garcia would not appreciate the dangers of the train operations.

The Court finds that based on the evidence presented, there is a genuine issue of material

fact as to whether Garcia, *et. al.* can prove the three elements laid out in UJI 13-1306 under which a landowner owes an ordinary duty of care to trespassers. At this time, however, the Court will not find as a matter of law either that BNSF owed an duty of ordinary care or was only required to refrain from willful or wanton conduct. The Court will instead determine, after reviewing all the evidence presented at trial, whether there is sufficient evidence to support an ordinary duty of care under UJI 13-1306.

### 2.    BNSF's Actions As Negligent or Willful or Wanton Conduct

BNSF next asks the Court to find as a matter of law that the actions alleged by Garcia, *et. al.* do not rise to the level of either negligence or willful or wanton conduct. Garcia, *et. al.* allege that BNSF was negligent for several actions or omissions which essentially include:[3]

(1)    the failure to properly warn individuals of the presence of the railroad tracks, either through signs, by marking tracks, or by blocking access to BNSF property;

(2)    the failure of the eastbound train to take any steps to determine whether Garcia

---

[3] Garcia, *et. al.* make a number of specific allegations, which essentially constitute the above stated claims: (1) failure to properly mark the tracks; (2) failure to warn individuals who could reasonably be foreseen to be in the area of the railroad tracks of the presence of the tracks and trains; (3) failure to place gates or other barriers; (4) allowing individuals access to the railroad tracks; (5) failure to take adequate steps to protect the public; (6) failure to exercise ordinary care in the operations of their train; (7) failure to brake or take other evasive action when it realized there were vehicles on the track; (8) failure to adequately and properly communicate between the eastbound and westbound train regarding the fact that there was a vehicle on or in close proximity to the tracks; (9) failure to keep proper lookout; (10) failure to operate the train in a safe and proper manner. Although not pleaded in the Complaints or Complaints-In-Intervention, Garcia, *et. al.* also allege that BNSF was negligent for failing to attempt to extinguish the fire in Garcia's vehicle following the collision. This allegation is not addressed in BNSF's motion for summary judgment and will not be ruled upon by the Court.

25

was a trespasser, and to warn the westbound crew of the presence of the vehicles;

(3) the failure of the westbound crew to use its emergency brakes immediately upon discovering the vehicles in the vicinity of the overpass; and

(4) operating the train at a dangerously high speed in a residential area.

As the Court has ruled, a factual predicate must be established before determining the appropriate duty of care owed to Garcia, *et. al.* Without the duty of care determined, it would be inappropriate for the Court to find as a matter of law that BNSF alleged actions as were neither negligent nor willful and wanton. As such, the Court denies at this time, BNSF's Motion for Partial Summary Judgment as related to the actions alleged by Garcia, *et. al.* There is one exception, however. The Court finds that under applicable law, Garcia, *et. al.* cannot state a claim for negligence arising out of BNSF alleged excessive speed.

Garcia, *et. al.* argue that BNSF was negligent in operating its westbound train at a high speed in a residential area. The evidence indicates that the westbound train was traveling at a speed of approximately 44 to 46 m.p.h., in compliance with federal speed limits as adopted by the Federal Railroad Administration. In *CSX Transportation v. Easterwood*, the Supreme Court held that federal regulations adopted by the Federal Railroad Administration, pursuant to the Federal Railroad Safety Act, preempt any state law claims covering the same subject matter as the regulation. 507 U.S. 658 (1993). The Court found, in *CSX Transportation*, that a negligence claim arising out of an allegation of excessive speed was preempted by the FRSA where compliance with the statue was demonstrated. *Id.* at 673-75. *CSX Transportation* is directly on point regarding Garcia, *et. al.*'s own claim that BNSF was operating at an unsafe speed and is accordingly preempted. The Court finds that as a matter of law Garcia, *et. al.* cannot make a

26

claim of negligence based on BNSF's alleged excessive speed. Summary judgment on this claim is granted in favor of BNSF.

In conclusion, the Court denies BNSF's Second Motion for Partial Summary Judgment, as related to the applicable duty of care and BNSF's alleged negligence. The Court will determine at the close of evidence, the appropriate duty of care to be applied. However, the Court grants BNSF's motion as related solely to Garcia, *et. al.*'s claim of excessive speed.

### C. BNSF'S THIRD MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS OF NEGLIGENCE PER SE

BNSF moves this Court to grant summary judgment in its favor as to Garcia *et. al.*'s claims of negligence per se. In order to state a claim for negligence per se under New Mexico law, a party must prove (1) there is a statute which prescribes certain actions or defines a certain standard of conduct, either explicitly or implicitly; (2) the defendant violated the statute; (3) the plaintiff was in the class of persons sought to be protected by the statute; and (4) the harm or injury to the plaintiff was of the same type of harm or injury the statute aims to prevent. *Archibeque v. Homrich*, 88 N.M. 527, 532 (1975); UJI 13-1501 NMRA 1999. BNSF argues that Garcia, *et. al.* cannot prove as matter of law that BNSF violated any statute. Even construing the evidence in the light most favorable to the non-moving party, the Court agrees, that Garcia, *et. al.* have failed to offer any evidence that BNSF violated any statute, an essential element of the negligence per se claim.

Garcia, *et. al.* argue initially that BNSF is merely attacking the sufficiency of their pleadings in a disguised 12(b)(6) motion to dismiss for failure to state a claim. This argument

misses the mark. The sufficiency of the pleadings is not being attacked in this motion. Rather,

Garcia, *et. al.* are required as the first element of negligence per se to offer evidence of a specific

statute. Garcia, *et. al.* next attempt to avoid summary judgment by arguing that "various state

statutes related to the railroad industry have been inquired about." *Response to Third Motion for*

*Partial Summary Judgment* at 4. In order to survive a summary judgment motion, a party must

do more than raise inquiries. Rather, a party has the burden to demonstrate that there is a

genuine issue of material fact as to whether an essential element of her claim can be proven at

trial. *See Celotex*, 477 U.S. at 324. Garcia, *et. al.* have failed to meet this burden.

As a basis of the negligence *per se* claim, Garcia, *et. al.* point to only one statute that

BNSF allegedly violated:[4] the failure to maintain "good or sufficient crossings at places. . .

where its railroad crosses public highways, city, town or village streets at grade, now or hereafter

to be opened for public." NMSA 1978, § 63-3-36 (1999 Repl.Pamp.). A "public highway" is

defined as "every place or way of whatever nature open to the use of the public as a matter of

right for purposes of vehicular travel." NMSA 1978, § 63-3-35 (1999 Repl.Pamp). The essence

of Garcia, *et. al. 's* argument is that BNSF's alleged failure to provide adequate warning or notice

that Garcia was entering BNSF property transformed the BNSF private dirt road into a "public

---

[4] Garcia, *et. al.* also assert in a single sentence that BNSF was negligent per se for failing to test the railroad crew members for drugs or alcohol immediately following the collision as required under 49 C.F.R. 219.201. The question of whether BNSF complied with the federal regulation is the subject of BNSF's Third Motion In Limine. In their Response to the Third Motion in Limine, Garcia, *et. al.* specifically state that they are not alleging that any negligence arose out of the failure to test, but rather that the failure to test is evidence that the BNSF crew members may have been intoxicated. Based upon this argument, and upon the Garcia, *et. al.'s* failure to make any argument to the contrary in the present motion, the Court will not address this statute in ruling on whether a claim of negligence per se has been shown.

highway." As such BNSF allegedly violated their statutory duty to maintain safe crossing for vehicles. Garcia, *et. al.* point to no cases supporting their proposition that a private road can legally become a public highway if proper warning is not made. The Court, likewise, is not aware of any authority which sustains such an argument. The evidence does not support the assertion that the BNSF private road was in fact a public highway. At no time has it ever been alleged that BNSF opened up their property to the public "as a matter of right for purposes of vehicular travel." Although Garcia, *et. al.* have provided evidence that trespassers did enter BNSF property prior to the collision, this evidence may be probative only of whether BNSF had actual or constructive notice of the trespassers. There is simply no logical connection that because trespassers entered BNSF property, the road was opened as a "matter of right". In fact, New Mexico case law establishes that frequent public crossing of railroad tracks does not convert the railroad tracks into a public highway nor convey a legal right to use the property for crossing. *See Ruiz v. Southern Pacific Transportation Co.* (Ct. App. 1981) (quoting *Cadelaria v. A.T. & S.F. R'y Co.*, 6 N.M. 266 (1891) ["Can it be contended that because persons were in the habit of crossing over the tracks wherever they pleased, without regard to the regular crossings...this fact would constitute a legal right for them to be upon the tracks of the defendant? We think not".]). Other legal authority indicates that although a person who inadvertently strays a few feet from the public highway onto adjacent private land may still be considered to be a user of the public highway, such a privilege ends after the person traverses a distance onto the adjacent land. *See Prosser on Torts* § 57. The undisputed facts in this case establish that the accident occurred on BNSF's private road. Although Garcia entered the land inadvertently, she traversed a significant distance resulting in the termination of any legal right associated with the public highway. There

29

is also evidence that BNSF ejected trespassers from their property on occasion, thereby undermining any suggestion that the private road was opened "as a matter of right." There is simply no basis either in fact or law to support the claim that by failing to warn, or by virtue of trespassers entering BNSF property, the private road was transformed into a public highway, thereby giving rise to a duty to provide safe crossing.

The Court finds that Garcia, *et. al.* have provided no evidence supporting the basic elements of a negligence per se claim. BNSF's motion for summary judgment as to the claims of negligence per se is therefore granted.

### D.    GARCIA'S MOTION FOR SUMMARY JUDGMENT

BNSF claims damages for cargo and crew leave benefits. Garcia moves for summary judgment on BNSF's claim for damages on the grounds that: (1) C.L. Merritt, the fact witness offered to show the amount of damages lacks personal knowledge, (2) the damages were not computed with certainty, and (3) BNSF is required to have an expert testify that the BNSF crew's trauma leave was medically necessary. BNSF disputes these contentions and asks the Court to grant summary judgment in its favor as to damages claimed. The Court finds Garcia's arguments without merit and denies Garcia's Motion for Summary Judgment. The Court also denies BNSF's motion for Summary Judgment as to damages claimed.

Garcia first argues that Mr. Merritt does not have personal knowledge of the BNSF claims process, but rather relies upon documents provided by the BNSF claims processors, Steve Griego and Rick Folley. Mr. Merritt's deposition testimony reveals that he has experience in processing hundreds of railroad claims and is familiar with the process involved in assessing

damages, including the BNSF policy to recoup losses through selling damaged goods as salvage. In his deposition, Mr. Merritt testified that BNSF had incurred damages in the amounts of $582,483.94 for computers; $11,129.60 for styrofoam; $3,315.22 in crew leave benefits. Of this amount, $205,524 was recouped in salvage, leaving total damages claimed as $391,404,76. Merritt bases his testimony upon documents provided to him by the BNSF claims department. Although personal knowledge is generally required for non-expert testimony, a witness may rely upon business records under the hearsay exception set forth in FED. R. EVID. 803(6). In order to be admissible the business record must be a product of regularly conducted business activity, and must be authenticated by a custodian or other qualified witness. The term "other qualified witness" should be given the broadest interpretation, allowing authentication by any witness who understands the record keeping system. *Weinstein's Federal Evidence* § 803.11[1]. Based upon Mr. Merritt's deposition testimony, the Court is persuaded that BNSF regularly prepares claim damages in the course of its business activity. The Court is further confident that either Mr. Merritt, or his associates, Mr. Foley and Mr. Griego, will be able to lay the proper foundation at trial, allowing for the admission of Mr. Merritt's testimony and the business records. The Court therefore finds that Mr. Merritt has sufficient knowledge and will be able to lay an adequate foundation for his testimony regarding the damages claimed. However, until such a foundation is laid and the business records are authenticated, the Court cannot find as a matter of law or fact that BNSF has proven the damages claimed. It is on this basis that the Court denies BNSF's cross-motion for summary judgment.

The Court also finds no merit in Garcia's claim that the damages have not been calculated with certainty. As an initial matter, *Servants of the Paraclette v. Great American, Inc.*, cited by

Garcia for the proposition that damages must be calculated with certainty, in fact requires only

that the *cause* of the damages must be calculated with certainty. 866 F.Supp. 1560, 1578 (D.

N.M. 1994). Rather, under New Mexico law, damages do not need to be calculated with

mathematical certainty, but rather only be subject to reasonable ascertainment and not based

upon speculation or guesswork. *See Mascarena v. Jaramillo,* 111 N.M. 410, 415 (1991);

*Ranchers Exploration & Dev. Co. v. Miles,* 102 N.M. 387, 389 (1985). Furthermore, to the

extent that reasonable certainty is required in the computation of damages, the Court finds that

BNSF has alleged its damages with sufficient certainty to bar summary judgment on this point.

The Court also disagrees with Garcia's final point that expert testimony is required to

prove the trauma leave taken by BNSF employees were related to the collision. The case relied

upon by Garcia, *Hermann v. Miners's Hospital,* discusses proof of damages in the context of

New Mexico worker's compensation law, NMSA § 52-1-28(B), which requires expert testimony

to prove causation. 111 N.M. 550, 552 (1991). There is no New Mexico case the Court is aware

of that requires expert witness testimony concerning causation in employee damages outside of

the area of workers' compensation law. To the contrary, the New Mexico Supreme Court has

stated that "[t]he use of expert medical testimony should be employed when the trial Court

reasonably decides that it is necessary to properly inform the jurors on the issues. *Foltz v. State,*

110 N.M. 457, 471 (expert testimony not required for plaintiff to establish emotional injury).

The Court does not find that expert testimony is necessary to establish the amount of damages

incurred by BNSF for the crew's trauma leave.

Garcia's motion for summary judgment as to damages claimed is therefore denied. The

Court also denies BNSF's cross-motion for summary judgment on the issue of damages.

## CONCLUSION

For the above stated reasons, the Court hereby makes the following rulings:

(1) Defendants/Counter-Plaintiffs Jacqueline Garcia, Cora Chadwick and Rick Chadwick's Motion to Dismiss **[Doc. No. 218]** is well taken and will be **GRANTED**;

(2) Plaintiff BNSF's First Motion for Partial Summary Judgment **[Doc. No. 200]** is partially well taken and will be **GRANTED IN PART** and **DENIED IN PART**;

(3) Plaintiff BNSF's Second Motion for Partial Summary Judgment **[Doc. No. 190]** is partially well taken and will be **GRANTED IN PART** and **DENIED IN PART**;

(4) Plaintiff BNSF's Third Motion for Partial Summary Judgment **[Doc. No. 194]** is well taken and will be **GRANTED**;

(5) Plaintiff BNSF's Fourth Motion for Partial Summary Judgment **[Doc. No. 204]** is **MOOT**;

(6) Defendant Jacqueline Garcia's Motion for Summary Judgment **[Doc. No. 183]** is not well taken and will be **DENIED**.

_____
**MARTHA VÁZQUEZ**
**U. S. DISTRICT COURT JUDGE**


Attorneys for Plaintiff BNSF
Clifford Atkinson
John Thal

Attorneys for Defendants / Plaintiffs-In-Intervention
Jim Branch
Felicia Weingartner
Brian Branch

Attorney for Third-Party Defendant
Gordon McCulloch