CLERK'S COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
SANTA FE, NEW MEXICO

JAN - 7 2000

*signature*
CLERK

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,

    Plaintiff/Counter-Defendant/Third-Party Plaintiff,

vs.

JACQUELINE GARCIA,

    Defendant/Counter-Plaintiff,

ALLSTATE INSURANCE COMPANY
and RICKY CHADWICK,

    Third-Party Defendants,

and

CORA CHADWICK, Individually, RICKY CHADWICK,
as the Co-Personal Representative of the ESTATE OF
ROBERT SHEPPARD and the ESTATE OF ERMELINDA
SHEPPARD, and FIRST FINANCIAL TRUST COMPANY,
as the Co-Personal Representative of the ESTATE OF
ROBERT SHEPPARD, and the ESTATE OF ERMELINDA
SHEPPARD, and as TRUSTEE of the ROBERT SHEPPARD
and ERMELINDA SHEPPARD SHRINER'S CHILDREN
HOSPITAL TRUST,

    Plaintiffs-in-Intervention,

vs.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,
    Defendant-in-Intervention,

vs.

JACQUELINE GARCIA, RICKY CHADWICK,
and ALLSTATE INSURANCE COMPANY,
    Third-Party Defendants on Complaint in Intervention.

No. CIV 98-740 MV/RLP

# MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff/Counter-Defendant BNSF's (1) First Motion in Limine to Exclude the Testimony of John Bentley, Bill Patterson and Melissa Patterson for Failure to Comply With Discovery Deadlines, filed October 4, 1999 **[Doc. No. 162]**; (2) Second Motion In Limine to Exclude the Expert Testimony of Jack Larks, Virginia Broussard and Robert Harner pursuant to FED. R. EVID. 702, filed October 4, 1999 **[Doc. No. 164]**. The Court, having considered the pleadings, relevant law, and being otherwise fully informed, finds that the first motion is well taken in part and will be **GRANTED IN PART** and **DENIED IN PART**. The Court further finds that the second motion in limine is in not well taken and will be **DENIED**.

## BACKGROUND

Plaintiff, Burlington Northen and Santa Fe Railroad (BNSF) filed suit after a devastating collision that occurred on March 15, 1997, between a BNSF train and a vehicle driven by Defendant Jacqueline Garcia (Garcia). Garcia's two young children, Ermelinda Sheppard and Robert Sheppard, were killed as a result of the collision and ensuing explosion. Garcia filed a counterclaim alleging that BNSF was negligent, *inter alia*, for failing to provide proper warning, failing to mark the area of the railroad tracks, and failing to stop the train as soon as Garcia's vehicle was noticed on the tracks by the BNSF train conductors.

## I. FIRST MOTION TO STRIKE THE TESTIMONY OF JOHN BENTLEY, BILL PATTERSON AND MELISSA PATTERSON UNDER FED. R. CIV. P. 37

In its first motion in limine, BNSF seeks to exclude the testimony of Garcia, *et.al.*'s expert witnesses John Bentley, Bill Patterson, and Melissa Patterson for failure to comply with

2

their discovery obligations under FED. R. CIV. P. 26.

A. **Legal Standard of Review**

Federal Rule of Civil Procedure 37 authorizes a Court to issue sanctions against a party who fails to comply with discovery obligations. Rule 37(c) provides, in relevant part, that

> "[a] party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1)...shall not, *unless such failure is harmless*, be permitted to use as evidence at trial, at hearing, or on any motion any witness or information not so disclosed," (emphasis added).

The trial Court has broad discretion in determining whether a discovery violation under Rule 26(a) is justified or harmless. *Woodworker's Supply, Inc. v. Principal Mut. Life*, 170 F.3d 985, 993 (10th Cir. 1999). In exercising its discretion the Court should consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the party's bad faith and willfulness in failing to make the required disclosures. *Id.*

B. **Discussion**

1. *John Bentley*

BNSF seeks to exclude the testimony of John Bentley for failure to provide an expert witness report as required under FED. R. CIV. P. 26(a)(1). Garcia responds that John Bentley is not testifying as an expert, but rather is testifying solely to provide the foundation for a computer model relied upon by one of Garcia, *et. al*'s other expert witnesses, Jack Larks. As such, Garcia, *et. al.* contend that no expert witness report was required. The dispositive question therefore, is whether John Bentley is testifying as an expert witness. If Bentley is an expert, then his testimony is subject to exclusion for failure to provide an expert witness disclosure or report.

3

However, if Bentley is merely a lay witness providing factual testimony within his personal knowledge, then such testimony is not subject to exclusion for failure to provide an expert report.

John Bentley developed Freight Train Emergency Braking software, a computer program used to calculate train braking distances. Using the Freight Train Emergency Braking software, Bentley prepared calculations as to the stopping distance of the BNSF train and provided these figures to Jack Larks. Jack Larks in turn uses these figures in providing his expert testimony that the westbound BSNF train could have stopped earlier if it had been warned by the eastbound train. John Bentley intends to testify as to the accuracy and reliability of the Freight Train Emergency Braking software, including the fact that the Freight Train Emergency Braking software is used by the National Transportation Safety Board. The proffered purpose of Bentley's testimony is to lay a foundation for the expert witness testimony of Jack Larks. Under FED. R. EVID. 703 an expert witness' testimony must be based upon techniques, data or facts "reasonably relied upon by experts in the particular field." Bentley's sole purpose in testifying is to establish that the computer program used by Lark's in making his calculations is "reasonably relied upon by experts in the particular field." Bentley bases such testimony on his personal experience as developer and provider of the software.

Under FED. R. EVID. 701 a lay witness may offer opinion testimony if the opinion is (1) rationally based on the perception of the witness and (2) helpful to the trier of fact. *Getler v. Wal-Mart Stores*, 66 F.3d 1119, 1124 (10th Cir. 1995). As a developer and distributor of the Freight Train Emergency Braking software, Bentley is certainly in the position to know who uses the software and how it is perceived by experts in his field. Furthermore, as the creator of the software, he has a basis for his opinion regarding the software's accuracy. Bentley's testimony is also helpful to the trier of fact in determining whether the stopping distance calculations

4

produced by the Freight Train Emergency Braking software and ultimately relied upon by Jack Larks, are in fact reliable and accurate.

The mere fact that Bentley bases his opinion on specialized experience or knowledge does not require him testify as an expert. Many courts have allowed lay witnesses to provide testimony on expert or specialized matters once a proper foundation is established. *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996) (treating physician could testify as to standard of care provided by another physician in a medical malpractice case); *Williams Enters v. Sherman R. Smoot Co.*, 938 F.2d 230, 234 (D.C. Cir. 1991) (insurance broker could testify as a lay witness on account history based on work experience); *United States v. Myers*, 972 F.2d 1566, 1576-77 (11th Cir. 1992) (police officer could testify, based on 19 years of experience, that certain bodily burns appeared to be injuries from a stun gun). Likewise, Bentley, as developer and distributor of Freight Train Emergency Braking software has established a sufficient foundation to support his opinion that the Freight Train Emergency Braking software is accurate and relied upon by the experts of his field. It is also appropriate for Bentley to explain the foundation of his opinion that the Freight Train Emergency Braking software is reliable, by explaining the methodology used by the software in arriving at its calculations. This testimony is within Bentley's personal knowledge and would be helpful to the trier of fact in assessing the accuracy of the stopping distances calculated by the Freight Train Emergency Braking software.

Contrary to the assertion of BNSF, it is not essential for the Court at this time, to explore whether Mr. Larks has a basis for his expert opinion of Freight Train Emergency Braking. Rather, it is sufficient that Mr. Bentley has a basis for his opinion as to the reliability of the Freight Train Emergency Braking software and that such opinion will aid the jury in determining the appropriate weight to be given to Mr. Lark's expert opinion. The Court, exercising its role as

gatekeeper, will determine the admissibility of Jack Lark's expert testimony under FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) at trial, as set forth *infra* section II(B)(1). The Court therefore holds that John Bentley may provide lay testimony regarding the development and accuracy of the Freight Train Emergency Braking software, including the identification of those people or organizations using the software.

### 2. Bill Patterson

BNSF next seeks to exclude the testimony of Bill Patterson for failure to provide a timely expert witness report. Bill Patterson, an economist, intends to provide expert witness testimony regarding the damages to the deceased children, in support of their wrongful death claims. This Court permitted the Estates of the children to intervene as Plaintiffs-In-Intervention and join these claims on July 19, 1999. The pecuniary and non-pecuniary damages of the children only became relevant after the intervention of the Children's Estates and the joinder of their wrongful death claims. At the time of the intervention, the Plaintiffs-In-Intervention notified BSNF of their intention to use the testimony of Bill Patterson. On August 12, 1999 the Plaintiffs-In-Intervention filed their complaint upon BNSF. The expert economist report was submitted to BSNF counsel on September 2, 1999. Discovery was closed in this case on September 1, 1999.

The extreme sanction of excluding testimony under FED. R. CIV. P. 37(C) is not warranted in this case. As an initial matter, the late disclosure of the expert witness report is justifiable, considering the Court granted the motion to intervene just over a month before the Plaintiffs-In-Intervention submitted the required reports. BNSF argues that it has been prejudiced by this late disclosure because it was unable to depose the expert witness or retain its own expert witness on the children's damages until after the close of discovery. The Court agrees that BNSF has suffered some prejudice, however, this prejudice is curable. At the time

this Court grant the motion to intervene, it noted that the scope of discovery may have to be expanded. The Plaintiffs-In-Intervention indicated a willingness to offer the expert witness Bill Patterson for deposition, despite the closure of discovery in this case. Furthermore, the Court is not persuaded that BSNF's failure to retain its own expert economist is the fault of the Plaintiff-in-Intervention's late expert witness report. BNSF had notice as of July 19, that the Plaintiffs-in-Intervention intended to call an economic expert. Certainly at the time the Court permitted intervention and joinder, BNSF could have anticipated that a dispute regarding the children's damages would arise. Based on these findings, Plaintiff-Counter Defendant BNSF's motion to exclude the testimony of Bill Patterson is denied.

### 3. Melissa Patterson

BSNF moves to exclude the testimony of Melissa Patterson for failure to file any expert report at all. Plaintiffs-In-Intervention do not offer any explanation for the lack of expert witness report. The Court agrees with BSNF that the failure to provide the report is not justified and will prejudice BSNF who at this point has no information at all on Melissa Patterson. Therefore, the testimony of Melissa Patterson will be excluded pursuant to FED. R. CIV. P. 37(c).

## II. BSNF'S SECOND MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF JACK LARKS, VIRGINIA BROUSSARD AND ROBERT HARNER

In its second motion in limine, BNSF seeks to exclude the expert testimony of Jack Larks, Virginia Broussard and Robert Harner. BSNF essentially challenges both the qualifications of these potential expert witnesses as well as the bases forming their expert opinions.

### A. Legal Standard of Review

The trial court assumes a gatekeeping function in determining the admissibility of all

expert testimony. *See Kuhmo Tire Company v. Carmichael*, 526 U.S. 137 (1999). Pursuant to FED. R. EVID. 702, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify if scientific, technical or other specialized knowledge will assist the trier of fact to understand evidence or determine a fact in issue. As a preliminary matter, the Court must evaluate the witness's credentials to ascertain whether she qualifies as an expert under the criteria set forth in FED. R. EVID. 702. *See Weinstein's Federal Evidence* § 702.06[2]. In order for expert testimony to be admissible, the trial court must also determine whether the proffered evidence is reliable and relevant. *See Daubert*, 509 U.S. at 589. A reliable expert opinion must be based on scientific, technical, or other specialized knowledge, rather than belief or speculation. *Id* at 590. The Supreme Court set forth a nonexclusive list of factors courts should consider in deciding whether the proposed testimony is scientifically reliable including: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the rate of error of the technique or theory; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted within the relevant scientific community. *Id.* at 591-95. The test of reliability is flexible and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *See Kuhmo Tire Co.*, 526 U.S. 137.

**B.     Discussion**

Applying these principles to the present case, the Court will address each of the expert's testimony in turn. At the outset, the Court emphasizes that it does not favor excluding expert testimony, without providing a party with an opportunity to address any potential defects at trial. Therefore, at this time BNSF's Motion to Exclude the Testimony of Jack Larks, Virginia Broussard and Robert Harner is DENIED. However, the Court shares some of BNSF's concerns

8

about the proffered testimony. The Court will address BNSF's objections and its own concerns to the expert witness testimony, so that the Parties can resolve this issues prior to trial.

    *1.    Jack Larks*

Jack Larks intends to testify regard the stopping distances of the westbound train at various speeds. Specifically, Larks states that if the eastbound train had warned the westbound crew of their presence near the tracks, the westbound train would have slowed its speed, engaged its emergency brakes and avoided the accident. Larks also intends to testify that the engineer, Julian Rubio, was unreasonable in his belief that the Garcia and Lopez vehicles were BNSF company vehicles.

Pursuant to FED. R. EVID. 702, a witness must possess sufficient knowledge, skill, experience, training or education in order to qualify as an expert. Larks is a mechanical engineer with training in human factors. The parties do not provide an curriculum vitae or any other background on Mr. Larks making it difficult to assess his qualifications as an expert. In order to lay foundation for Mr. Lark's testimony, additional background information must be provided at trial.

In forming his opinions as to the train stopping speeds, Mr. Larks relies upon certain computer models provided by John Bentley of Train Dynamics.[1] The computer models are generated by Freight Train Emergency Braking, a software program Mr. Bentley developed. In making the stopping distance calculations, Mr. Bentley supplied the software program with

---

[1]BNSF also objects that the information supplied by the Emergency Train Braking System was not provided in a timely matter. The Court considers the untimely disclosure to be the result of BNSF's own delays in providing its expert witness disclosures, as addressed in this Court's November 30, 1999 order. Therefore this argument is without merit and will not be considered.

certain inputs, such as the number of rail cars, the brake pipe pressure, emergency braking factors, length of the train and other factors. The Freight Train Emergency Braking program uses time segments to determine stopping distance, which is generally considered the most accurate method of calculating stopping distance. The software developed by Mr. Bentley is routinely relied upon by experts in the field of train safety, including the National Transportation Safety Board, law enforcement agencies and engineers.

BNSF does not object to the accuracy of the Freight Train Emergency Braking program, but rather argues that Mr. Larks has no background or experience in calculating stopping distance, and therefore improperly relies solely upon the computer models. Specifically, BNSF is concerned that Mr. Larks has no understanding or awareness of the factors used by Bentley in determining the stopping distances, and thus has no basis for assessing the reliability of the stopping distances reached by the Freight Train Emergency Braking program. Indeed, in his deposition testimony, Larks demonstrated no knowledge of the methodology used by Mr. Bentley and the Freight Train Emergency Braking program in calculating the train stopping distances. Pursuant to FED. R. EVID. 703, an expert may rely upon any facts or data reasonably relied upon by experts in the field. *See Weinstein's Federal Evidence* § 703.5. An expert may even rely upon information supplied by another expert, including a computer model. *See, e.g., Vincoy v. United States*, Civ. No. 97-296 (Dec 31, 1998) (expert medical witness properly relied upon computer model provided by another medical expert). The Court is convinced by John Bentley's supporting affidavit that the Freight Train Braking System is reasonably relied upon by experts in the field of train safety when calculating stopping distances. Under FED. R. EVID. 703, Mr. Larks need not possess his own independent understanding of the computer models in order to testify as an expert, provided that a proper foundation is laid that others in the field

would also likewise rely on them. The Court agrees with BNSF, however, that Mr. Larks must have sufficient knowledge in the area of train stopping distances in order to provide expert testimony on the matter. Due to the lack of background material provided on Mr. Larks, the Court cannot assess his credentials on this topic. As stated earlier, Mr. Larks will not be permitted to testify on the subject of train stopping distances unless he can be qualified as an expert by knowledge, skills, experience, training or education.

BNSF also objects to Mr. Larks' opinion that it was unreasonable for Mr. Rubio to mistake the Garcia and Lopez vehicles for those belonging to BNSF employees. Mr. Larks bases this opinion on his experience with railroad operating rules and procedures. It is again difficult for the Court to assess the reliability of Mr. Larks' opinion because of the parties' failure to provide any background material. The Court is left only to rely only upon excerpts of deposition testimony and an expert report which do not fully address the issue. Mr. Larks must establish a more adequate foundation for this opinion in order to provide testimony at trial.

### 2. *Virginia Broussard*

Virginia Broussard intends to testify that (1) the eastbound train crew should have reported the vehicles of Garcia and Lopez when they were first discovered; and (2) that the westbound crew should have attempted to extinguish the fire that ensued as a result of the collision. Ms. Broussard was employed in the railroad industry for approximately 15 years. Since 1986 she has been engaged in a railroad consulting service. Ms. Broussard began her career in the railroad industry in 1971 and was employed as a telegrapher, a clerk ex-board, a crew crawler crew dispatcher, assistant crew dispatcher, yard clerk, and firefighter. In 1977, Ms. Broussard began employment with AT& SF (now BNSF) where she ultimately worked for eight years as an engineer. In reaching her opinions she relies solely upon her experience and training

11

with the railroad company and what was expected of her as an employee for AT & SF in Santa Fe.

BNSF challenges Ms. Broussard's credentials on the grounds that she took periodic leaves of absences from her job at AT & SF for health reasons and was involved in train collisions while employed at AT & SF. BNSF further argues that Ms. Broussard has no educational background in physics or mathematics and therefore is not qualified to testify as to the appropriate response of the eastbound and westbound crew in this case. BNSF also contends that Ms. Broussard's experience as a train employee was too removed from train operations and management, thus rendering her unqualified to give an opinion on the BNSF operating rules and procedures.

The Court is not persuaded by these arguments. Despite her lack of college education, Ms. Broussard has sufficient training, knowledge and experience to provide testimony as to whether the eastbound or westbound crew acted appropriately. The eight years Ms. Broussard spent as an engineer weigh particularly in favor of admitting her testimony. As an engineer Ms. Broussard worked on a regularly scheduled train route. Such experience would render her especially competent to testify regarding appropriate conduct of train crew members. The health problems faced by Ms. Broussard's and the collisions that occurred during her employment do not detract from the knowledge, training and experience she gained during her eight years as an engineer.

BNSF argues that based on her deposition testimony any opinion offered by Ms. Broussard would be speculative, and cannot satisfy the reliability requirement of *Daubert*. BNSF challenges the foundation of following portions of Ms. Broussard's opinions: (1) BNSF employees were under a duty to report all vehicles in close and hazardous proximity to the

railroad tracks; (2) Garcia and Lopez's vehicles were in close and hazardous proximity to the railroad tracks, thereby giving rise to a duty to report; (3) the westbound train would have slowed down had it been notified of the presence of the vehicles; (4) by slowing down, the westbound train could have averted the collision; and (5) the BNSF crew was under a duty to use their fire extinguishers to mitigate any further harm. The Court shares BNSF's concerns with several portions of Ms. Broussard's testimony. While the Court does agree with BNSF that certain portions of Ms. Broussard's testimony appears speculative, the Parties will have an opportunity at trial to establish a foundation for her testimony. If the concerns the Court raises are not addressed at that time, then some of the testimony of Ms. Broussard may be excluded. The Court will address each of BNSF's concerns in turn.

First, BNSF questions Ms. Broussard's opinion that the eastbound crew had a duty to report any potentially hazardous vehicles in the vicinity of the railroad tracks. BNSF challenges Ms. Broussard's reliance on the expired written rule which she characterizes as "company policy" that she believes imposes a duty to report unusual vehicles in close proximity of the tracks. BNSF also argues that Ms. Broussard's own training as a railroad employee is too remote and cannot be compared to the training in place today. The Court finds these arguments to be unpersuasive. Ms. Broussard bases her opinion that the eastbound crew should have reported the Garcia vehicles on several factors, including the BSNF general safety rule in place today which requires train employees to report "unusual conditions," as well as her own training and experience. BNSF's own experts rely on the BNSF general safety rule in forming their opinion that the eastbound crew members did not have a duty to report the vehicles because the vehicles did not represent an "unusual condition." Ms. Broussard reaches a different conclusion based upon the same rule and her own experience, that the vehicles did in fact represent an "unusual

13

condition" that should have been reported. In addition, it is clear that the "company policy" which Ms. Broussard believes requires employees to report unusual vehicles is still in place today. As demonstrated by the deposition testimony of BNSF's expert, Kevin Wilde, BNSF train operators are trained to report all trespassing and potentially hazardous vehicles. Although Ms. Broussard does not rely upon Mr. Wilde's deposition testimony in reaching her opinion, Mr. Wilde's deposition indicates that indeed her training on this subject is similar to the BNSF training in place today. Ms. Broussard relies upon some of the same factors considered by BNSF's experts, Mr. Kevin Wilde and Mr. Gary Wolfe, including BNSF's general safety rule and the employee training to report all hazardous vehicles. The Court finds that Ms. Broussard's experience and training as a railroad engineer provides an adequate foundation for her opinion that there was a duty to report any hazardous vehicles the night of the collision. Based on this finding, the Court concludes that this portion of Ms. Broussard's testimony is sufficiently reliable to satisfy the requirements of *Daubert*. The Court also finds that this testimony will assist the jury in determining whether the BNSF crew acted in a negligent manner on the night of the collision.

BNSF next challenges the reliability of Ms. Broussard's conclusions that at the time the eastbound crew discovered the vehicles they were in close proximity, creating a hazardous condition, and thus requiring the eastbound crew to report the vehicles. Ms. Broussard bases this conclusion upon the fact that the eastbound engineer Julian Rubio saw the vehicles and pointed them out to the eastbound conductor. According to Ms. Broussard, the engineer would not have pointed out the vehicles if they were not in close proximity. Ms. Broussard did not take any measurements of the distance between the vehicle and the train at the time the eastbound crew noticed the vehicles. Nor does it appear that her opinion is based upon the measurements taken

14

by other witnesses. Although Ms. Broussard conducted a site inspection of the area, it is not clear from her expert report whether during the site inspection she ascertained the proximity of the vehicles to the eastbound train the night of the collision. The Court initially agrees with BNSF that Ms. Broussard's conclusions concerning the proximity and the hazardous nature of the vehicles may not be fully expanded in the report and therefore may appear speculative. It does not necessarily follow that the vehicles were in close proximity and thus creating a hazard merely because Mr. Rubio could see the vehicles and notified the conductor of their presence. Although Ms. Broussard has established that there is a duty to report all unusual vehicles creating a hazard, she has failed to provide a foundation for her opinion that Garcia's vehicle was in close and hazardous proximity, thereby giving rise to the duty to report. Ms. Broussard will have an opportunity at trial to establish a reliable basis for her conclusion that the vehicles were in close and hazardous proximity to the train. If she fails to do so, her testimony on this issue will not be admitted.

BSNF also objects to Ms. Broussard's opinion that the westbound crew would have slowed their speed had they been notified of the presence of the vehicles. This objection is not well taken. Ms. Broussard bases this opinion on her own training and experience as an engineer. In her experience, a reasonably prudent engineer would slow the train to 20 m.p.h. in the presence of uncertain conditions. As the Court noted earlier, Ms. Broussard's prior work experience allows her to form reliable opinions as to how a railroad crew should respond to certain situations.

BNSF also objects to Ms. Broussard's opinion that the accident would have been averted had the westbound crew slowed its speed. Ms. Broussard bases this opinion on her own experience as an engineer, but conducted no measurements or calculations into the stopping time

of the westbound train. The Court initially agrees that Ms. Broussard must provide a more reliable foundation for testifying as to the stopping distances of the train. Although Ms. Broussard's experience as an engineer may provide her with the basis for such an opinion, she states her opinion in a conclusory manner, without any explanation of the factors that affect stopping speeds, her own experience with stopping trains, or the stopping distance required for the type of train involved in the collision. *See, e.g., Taylor v. St. Louis Southwestern Railway Co.*, 746 F. Supp 50, 54 (D. Kansas 1990) (train engineers qualified to testify on the issue of train stopping distances).

BNSF finally objects to Ms. Broussard's testimony that the westbound train crew should have attempted to use their fire extinguishers to stop the fire. Once again, the Court finds that Ms. Broussard's testimony is properly based upon her experience as an engineer. Ms. Broussard's experience allows her to offer an opinion that train crews have a duty to attempt to extinguish fires. In her experience, train crew members are accustomed to walking great distances, carrying fire extinguishers or other heavy objects, and calling for assistance in the event of the fire. Such experience provides sufficiently reliable foundation for her testimony that the railroad crew had a duty to take steps to address the fire. The Court is concerned, however, about the basis for Ms. Broussard's opinion that the use of fire extinguishers would have prevented or mitigated the damage to the vehicle. It appears that Ms. Broussard is not aware of the precise time the fire started, the exact time it would have taken the crew to return to the scene of the collision and whether the fire could have been extinguished. It is critical to the admissibility of this expert evidence that a causal connection between the failure to use fire extinguishers and the fire that killed the children be established at trial.

   *3.*   *Robert Harner*

Mr. Robert Harner, a safety engineer intends to offer three opinions: (1) BNSF's "no trespassing" sign was inadequate; (2) BNSF should have constructed barriers blocking access to the road into the depot; and (3) the train crew members should have returned to the site of the collision to extinguish the fire. Mr. Harner received a Bachelors of Science in Industrial Technology and is certified as a Safety Engineer and Certified Safety Professional. Mr. Harner worked at Traveler's Insurance as a safety engineer for approximately twenty years. In his capacity as a safety engineer, Mr. Harner was responsible for evaluating the safety risks and recommending methods of reducing hazards. He was involved in evaluating safety risks for several commercial operations, including a mining company which operated a private railroad track. As part of the mining company evaluation, Mr. Harner evaluated right of way crossings, siding clearances and general warnings. The bulk of Mr. Harner's projects consisted of short-term construction area warnings. In 1980 Mr. Harner began working for Gulf Mineral Resources, where he concentrated on rail car and siding clearances. Currently he has his own consulting business. It appears to the Court that Mr. Harner has an extensive background in the area of harm reduction. Much of his work has concentrated on adequacy of warnings and accident prevention. Based upon his education, training, experience and knowledge in the area of safety engineering, the Court finds that he is qualified to offer his expert opinions. BNSF challenges Mr. Harner's credentials on the grounds that he has not published or lectured on the topic of railroad safety, and has not worked in the railroad industry in any capacity. The Court is not persuaded by these arguments. Mr. Harner is not required under FED. R. EVID. 702 to have published papers or lectured in order to qualify as an expert. It is sufficient that his education, background and training provide a basis for his opinions. Furthermore, the Court finds that Mr. Harner has sufficient expertise in safety engineering, without the necessity of

railroad operations experience.

BNSF also challenges the foundation of all of Mr. Harner's opinions. Mr. Harner bases his opinion that the BNSF warning sign was not adequate on both his experience as a safety engineer and on several treatises which he considers authorities in his field. According to Mr. Harner, the warning sign was defective because it was too high, not made of reflective paint, placed on the wrong side of the street and did not advise of the seriousness of the danger. In its place, Mr. Harner proposes a reflective sign containing a picture of a locomotive colliding with a vehicle. BNSF raises several critiques of Mr. Harner's opinion as to the adequacy of the "no trespassing" sign. Specifically, BNSF argues that Mr. Harner's opinion as to the adequacy of the warning sign does not take into account the fact that Ms. Garcia was drinking which may have impaired her perception of the sign. Furthermore, BNSF argues that Mr. Harner has no experience designing signs for a railroad company. BNSF contends that Mr. Harner failed to conduct a fault tree analysis which he considers an acceptable mode of analysis and resulted in neglecting a variety of factors, including Garcia's drinking the night of the accident. Finally, BNSF contends that the sign proposed by Mr. Harner as an adequate warning has never been used in the railroad industry and has not been tested for its reliability. The Court is not persuaded by these objections. While Mr. Harner did not conduct a fault tree analysis, there is no suggestion that such an analysis was the only or even the favored method of safety analysis. In addition, there is no indication that Mr. Harner's own analysis, relying upon his experience and training is not reliable. Any factors not considered by Mr. Harner at his deposition, including Garcia's drinking, can certainly be remedied by the time of trial. Furthermore, the Court is not convinced that a safety engineer with a general background, such as Mr. Harner, needs specific experience in the area of train operations, in order to offer an opinion as to what constitutes an

adequate warning. Mr. Harner must of course lay a foundation as to the adequacy of his proposed sign. Mr. Harner's opinion regarding BNSF's warning sign will assist the jury in determining whether BNSF failed to properly warn Garcia the night of the collision.

BNSF also challenges Mr. Harner's opinion that a barrier should have been erected blocking access to the BNSF road. Once again Mr. Harner bases his conclusions upon his own experience and authoritative treatises. Although BNSF points out some deficiencies in Harner's opinions, these weaknesses can be addressed through cross-examination.

Finally BNSF challenges Mr. Harner's opinion that the train crew should have attempted to use their fire extinguishers. While acknowledging that there was some risk involved in walking back to the vehicles carrying fire extinguishers, Mr. Harner believes that from a safety standpoint, the danger of the fire outweighed any risk of walking back to the vehicle. In forming this opinion, Mr. Harner relied upon his own training and experience, as well as the BNSF Safety Rules. BNSF argues that Mr. Harner has no background, training or experience that qualifies him to give a reliable opinion on the subject of a railroad crew member's duty to use fire extinguishers. The Court is not persuaded by this argument. Mr. Harner has sufficient experience in the area of safety engineering to determine the appropriate response to a fire. To the extent that Mr. Harner has failed to consider certain factors, such as the distance of the train's resting point to the Garcia car, the condition of the path back to the vehicle, or the exact weight of the fire extinguishers, such potential weaknesses can certainly can be addressed through cross-examination.

## CONCLUSION

The Court **HEREBY ORDERS** that Plaintiff/Counter-Defendant BNSF's First Motion in Limine **[Doc. No. 162]** is **GRANTED IN PART** and **DENIED IN PART**. The Court

**FURTHER ORDERS** that Plaintiff/Counter-Defendant BNSF's Second Motion in Limine [Doc. No. 164] is **DENIED**.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

Attorneys for Plaintiff BNSF
Clifford Atkinson
John Thal

Attorneys for Defendants / Plaintiffs-In-Intervention
Jim Branch
Brian Branch
Felicia Weingartner

Attorney for Third-Party Defendant
Gordon McCulloch